UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| GINGER TAVAREZ, as real party in interest,[1]<br><br>Plaintiff,<br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 2:22-cv-09367-BFM<br><br>**MEMORANDUM OPINION AND ORDER** |

### I. PROCEDURAL HISTORY

Jose L. T. applied for a period of disability and disability insurance benefits and for Supplemental Security Income payments, alleging physical disability that commenced on June 1, 2020. (Administrative Record ("AR") 16.) Plaintiff's applications were denied at the initial level of review and on

---

[1] On June 12, 2023, the Court was notified that Jose L. Tavarez had passed away, and substituted his wife, Ginger Tavarez, as real party in interest in this litigation. For clarity's sake, "Plaintiff" refers to Mr. Tavarez, or to the arguments made by his and now Ms. Tavarez's counsel, as appropriate in context.

reconsideration, after which he requested a hearing in front of an Administrative Law Judge. (AR 16, 151-53.) The ALJ held a hearing and heard from Plaintiff and a vocational expert (AR 56-60), after which he issued an unfavorable decision. (AR 16-26.)

The ALJ found at step two of the disability analysis[2] that Plaintiff had the severe impairments of chronic cough with gastroesophageal reflux disease; asthma; and allergic rhinitis. (AR 19.) At step four, the ALJ acknowledged that those conditions would limit Plaintiff's ability to work. Specifically, his "residual functional capacity"—what Plaintiff could do despite his limitations—would permit him to do only light work with no ladders, scaffolds, ropes, or unprotected heights; he had to avoid extreme temperatures and pulmonary irritants; and he could only occasionally do postural activities. (AR 19.)

Based on those limits, the ALJ concluded that Plaintiff would not be able to return to his prior work as a forklift operator. (AR 22.) But relying on the testifying vocational expert, the ALJ concluded that an individual with the limitations ascribed to Plaintiff would be able to perform other jobs in the national economy. (AR 23.) The ALJ thus found Plaintiff to be not disabled and denied his claims. (AR 26.) The Appeals Council denied review of the ALJ's decision. (AR 1-6.)

Dissatisfied with the Agency's resolution of his claims, Plaintiff filed a Complaint in this Court requesting that the matter be remanded. His sole argument here is that the ALJ erred at step five when he accepted the testimony of the vocational expert that there were over 1.5 million jobs that an individual with Plaintiff's residual functional capacity could perform. (Pl.'s Br. 6.)

---

[2] A five-step evaluation process governs whether a plaintiff is disabled. 20 C.F.R. §§ 404.1520(a)-(g)(1), 416.920(a)-(g)(1). The ALJ, properly, conducted the full five-step analysis, but only the steps relevant to the issue raised in the Complaint is discussed here.

Defendant requests that the ALJ's decision be affirmed. (Def't's Br. 11.)

## II. VOCATIONAL EXPERT'S TESTIMONY

At the hearing, the ALJ posited an individual with the workplace related limitations described above, and asked the vocational expert whether there was work in the national economy that such an individual could perform. The vocational expert testified that there was and identified three representative jobs that involved light work; were unskilled; and could be performed by an individual with Plaintiff's limitations: a mail clerk, with 71,000 jobs in the national economy; a marking clerk, with 268,000 jobs in the national economy; and a cashier, with 1.2 million jobs in the national economy. (AR 58-59.) That testimony, she noted, was consistent with the Dictionary of Occupational Titles, though she noted she had taken her own experience into account as it related to one of the ALJ's questions. (AR 59.)

Plaintiff's counsel asked the vocational expert to provide the source of her numbers. She explained that she purchased job numbers through U.S. Publishing, which published quarterly statistics from the Department of Labor and Bureau of Labor Statistics. (AR 60.) When prompted, she confirmed the name of the publication was the Occupational Employment Quarterly. (AR 60.)

After the hearing, Plaintiff submitted a post-hearing memorandum challenging the vocational expert's testimony. (AR 391.) Two arguments from that brief are relevant here. First, Plaintiff challenged the vocational expert's testimony that the three representative jobs available to Plaintiff were unskilled. Counsel pointed to a different source of information, the Occupational Information Network, or "O*NET," which classified each of those job as semi-skilled or skilled, not unskilled. (AR 391.)

Second, Plaintiff challenged the vocational expert's source publication, the

1  Occupational Employment Quarterly, arguing that it used an "inherently
2  fallible" methodology to calculate job numbers.
3      The ALJ addressed both points in his decision. As to the first, he noted
4  that the vocational expert testified that her testimony was consistent with the
5  Dictionary of Occupational Titles, or "DOT." And SSA regulations recognize the
6  DOT as a valid resource that vocational experts can rely on in testifying about
7  past relevant work and other jobs in the national economy in Social Security
8  cases. (AR 24.)
9      On the second point, the ALJ said that the SSA had taken administrative
10 notice of the Occupational Employment Quarterly. Plaintiff's view was nothing
11 more than a "differing opinion on how to weigh the vocational evidence," and
12 the ALJ found the testimony of the vocational expert persuasive because the
13 foundation for her opinion had been established. (AR 24-25.)
14
15             **III.   STANDARD OF REVIEW**
16     Under 42 U.S.C. § 405(g), the Court reviews the Commissioner's decision
17 to deny benefits to determine if: (1) the Commissioner's findings are supported
18 by substantial evidence; and (2) the Commissioner used correct legal standards.
19 *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1159 (9th Cir. 2008);
20 *Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012).
21 "Substantial evidence . . . is 'more than a mere scintilla.' It means—and only
22 means—'such relevant evidence as a reasonable mind might accept as adequate
23 to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)
24 (citations omitted); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th
25 Cir. 2014) (internal quotation marks and citation omitted). To determine
26 whether substantial evidence supports a finding, the reviewing court "must
27 review the administrative record as a whole, weighing both the evidence that
28

1  supports and the evidence that detracts from the Commissioner's conclusion."
2  *Reddick v. Chater*, 157 F.3d 715, 710 (9th Cir. 1998).

## IV. DISCUSSION

Plaintiff argues here that the ALJ erred at step five. His first argument is that the ALJ erred when he failed to resolve the conflict between the O*NET's classification of the occupations as unskilled and the vocational expert's classification of those occupations as skilled. His second and third arguments are related: he faults the ALJ for crediting the vocational expert's testimony relying on the Occupational Employment Quarterly, both because the Regulations do not include that publication on their list of reliable sources and because its data incorporates a methodology Plaintiff believes to be problematic. For the reasons set forth below, the Court respectfully disagrees with Plaintiff and affirms the ALJ's decision.

### A. O*NET Classifications

Plaintiff's first argument targets the vocational expert's testimony that certain jobs would be available to an individual, like Plaintiff, who was qualified only for unskilled work. Relying on the DOT, the vocational expert classified all three occupations—cashier, marker, and mail clerk—as unskilled. (AR 58-59.) In his post-hearing brief, Plaintiff presented contrary evidence. The DOT lists a specific vocational preparation score[3] of 2 for each of those jobs, making them unskilled. But the O*NET considers all three to be semi-skilled or skilled, with

---

[3] A job's specific vocational preparation score (or "SVP" in the briefing) reflects the amount of time it generally takes to learn the job. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). Unskilled jobs correspond to an SVP of 1-2; semi-skilled jobs correspond to an SVP of 3 to 4; and skilled jobs correspond to an SVP of 5 to 9. SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000) (citing 20 C.F.R. §§ 404.1568, 416.968).

5

a specific vocational preparation score of 4 or higher. He argued that the ALJ had a duty to address the conflict between the O*NET's classification and the vocational expert's opinion. (Pl.'s Br. 11.)

But the ALJ discharged his duty as to that argument. The ALJ noted that, while the Department of Labor may favor the O*NET over the DOT, Social Security Regulations continue to recognize the DOT as a reliable source of job description information on which a vocational expert can rely. (AR 24 (citing 20 C.F.R. § 404.1560(b) (permitting reliance on the DOT in determining whether claimant can return to prior work); 20 C.F.R. § 404.1566 (including the DOT on the list of "reliable" sources an ALJ can take administrative notice of with respect to vocational expert testimony as to whether work exists in the national economy in significant numbers).) He thus chose to credit the vocational expert's testimony based on the DOT over Plaintiff's proffer from O*NET.

The ALJ was entitled to make that call. The SSA "rel[ies] primarily" on the DOT for information about the requirements of different jobs in the national economy. SSR 00-4p. SSA regulations bless the DOT as a reliable source of information about jobs that exist in the national economy, but not the O*NET. *E.g.*, 20 C.F.R. § 404.1566(d). And in fact, the Social Security Administration explains on its website that it considered whether to migrate from the DOT to O*NET and found the O*NET not suitable as it "does not describe the physical requirements of occupations at the level of detail needed for claims adjudication." *See* SSA, "Occupational Information Systems Project FAQ"[4]; *see also Austin v. Saul*, 2020 WL 4336071, at *43 (S.D. Cal. Jul. 28, 2020) (citing a 2010 review commission by the SSA and conducted by the National Academy of Sciences that found O*NET "not suitable for disability adjudication"). Granting that there may be issues with the DOT, *see, e.g., White v. Kijakazi*, 44 F.4th 828,

---

[4] https://www.ssa.gov/disabilityresearch/ois_project_faqs.html

6

835 (9th Cir. 2022), substantial evidence still supports the ALJ's decision to credit the vocational expert's testimony that relied on the DOT over counsel's proffer that relied on the O*NET. Plaintiff's argument to the contrary is rejected.

## B. Administrative Notice of the Occupational Employment Quarterly

Plaintiff's second and third arguments are related and target, not the job requirements but the *numbers* of each job the vocational expert said were available in the national economy. The vocational expert took her job numbers from the Occupational Employment Quarterly, which "publish[es] quarterly statistics on employment from the Department of Labor and Bureau of Labor Statistics." (AR 60.) Plaintiff argues that the SSRs list certain publications deemed reliable for providing data about the availability of unskilled work, that the Occupational Employment Quarterly is not on that list, and that that publication has "never been identified by the agency as reliable." (Pl.'s Reply Br. 2.)

By regulation, the Agency may "take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. §§ 404.1566(d)(1)-(5), 416.966(d)(1)-(5). "*For example*," it says, the Agency will take administrative notice of the DOT, County Business Patterns, Census Reports, Occupational Analyses prepared for the SSA by various State employment agencies, and the Occupational Outlook Handbook prepared by the Bureau of Labor Statistics. *Id.* §§ 404.1566(d)(1)-(5), 416.966(d)(1)-(5) (emphasis added).

While true that the Occupational Employment Quarterly is not on the list, the Regulation makes clear that the list is illustrative, not exclusive. And

indeed, vocational experts "regularly utilize the Occupational Employment Quarterly in order to determine the availability of jobs in the economy." *Azizeh R. v. Kijakazi*, No. 20-cv-2016-MDD, 2021 WL 6072621, at *5-6 (S.D. Cal. Dec. 22, 2021) (collecting cases); *see Shaibi v. Saul*, No. 1:18-cv-00056-BAM, 2019 WL 3530388, at *2 (E.D. Cal. Aug. 2, 2019) (taking administrative notice of the Occupational Employment Quarterly and accepting the vocational expert's testimony even where the vocational expert was unable to explain how U.S. Publishing generated its job numbers). The mere fact that the Occupational Employment Quarterly is not on the list of reliable sources does not alone persuade the Court that the vocational expert's use of that publication for sourcing job numbers undermines the ALJ's decision to credit her testimony.

## C. Foundation for the Vocational Expert's Testimony

But, Plaintiff continues, it is not only that the publication is not listed in the Regulation. Instead, he argues, there is a specific reason to doubt that the Occupational Employment Quarterly is a reliable source of job numbers. The issue he flags is not novel; it is well described in numerous appellate decisions. *See, e.g., Chavez v. Berryhill*, 895 F.3d 962, 965-66 (7th Cir. 2018); *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 446-47 & n.4 (2d Cir. 2012). In short, just like the vocational expert did here, vocational experts frequently testify to the number of jobs available in the national economy that correspond to particular DOT job titles. But doing so is not as simple as looking it up in the DOT. The DOT lists job titles and describes the skills required to do each one; it does not provide statistics about the number of jobs available for each job title. For that information, vocational experts must rely on some source other than the DOT. *Brault*, 683 F.3d at 446. Several sources of raw job numbers exist, including the Bureau of Labor Statistics and the Census Bureau, but none of them break down

job numbers by DOT title. *See Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1281 (11th Cir. 2020); *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014). To get to the job numbers testimony vocational experts give, then, requires mapping the national data onto DOT job titles.

DOT titles are generally more granular than those provided by these other sources, which means several different DOT listings may map onto a single job category. *Brault*, 683 F.3d at 446. So once the jobs in each category have been mapped onto the DOT titles, the total numbers of jobs for a particular job category have to be allocated among the DOT listings that fit that category.

One method of dealing with the allocation problem has been the subject of critique: the "equal distribution methodology." The Ninth Circuit's decision in *Kilpatrick v. Kijazaki*, 35 F.4th 1187 (9th Cir. 2022), provides a concrete example of the use—or better, misuse—of the equal distribution methodology. There, counsel reviewed the Department of Labor's statistics showing that, nationally, there were 105,560 jobs in the "usher" category. Counsel indicated that the "usher" category mapped onto five different DOT titles that had different requirements. Counsel took the total number of available jobs in the usher group and divided it equally among the five DOT occupations within the group (105,560/5 = 21,112). Counsel had data showing that 28.8% of usher positions were full time, and so he multiplied the total for each group by 28.8%, assuming that 28.8% of the positions in each subgroup were full-time (21,112 x 28.8%). Based on his calculations, he concluded there were only 6,080 full-time usher jobs in the DOT listing at issue. He used this number to try to impeach the vocational expert's testimony that there were 64,000 usher jobs in a particular DOT title in the national economy, and on appeal he faulted the ALJ for crediting the vocational expert's number over his own. *Kilpatrick*, 35 F.4th at 1190-91.

1 2 3 4 5 6 7 8 9 10 11 12 13

The Ninth Circuit noted that the equal distribution method has an "improbable assumption" baked into it: that all jobs within a particular category have "the exact same number of full-time jobs." *Id.* at 1194. But it was not the equal distribution method itself that was the evil; it was the use of the methodology by a person who was not trained to consider that data, or able to explain why those numbers were appropriate in a particular case, or to modify them as might be necessary to give accurate information. Counsel had no expertise in calculating job numbers in the national economy, "candidly conceded" that his figures may not be completely accurate, relied on dated statistics, *and* made the "improbable assumption" that the jobs were equally distributed among the categories. *Id.* at 1194 (citing *Chavez*, 895 F.3d at 966)). For all those reasons, the Ninth Circuit concluded that counsel's proffer did not undermine the vocational expert's testimony.

14 15 16 17 18 19 20 21 22 23

The Seventh Circuit has said much the same. That court has, in several cases, criticized testimony from vocational experts that incorporates the equal distribution method. *See, e.g.*, *Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022); *Chavez v. Berryhill*, 895 F.3d 962, 965-70 (7th Cir. 2018). And yet, as *Ruenger* recognized, the Seventh Circuit has "never enjoined the use of the equal distribution method," or the use of testimony that relies on sources that use it. *Ruenger*, 23 F.4th at 764. Rather, what the Seventh Circuit has consistently found problematic is the inability of vocational experts to explain how they used various sources to arrive at their opinions. *See id.*; *see also Chavez*, 895 F.3d at 969-70.

24 25 26 27 28

Returning to this case, Plaintiff presented evidence—a 2002 letter from the publisher of the Occupational Employment Quarterly—reflecting that the Occupational Employment Quarterly uses the equal distribution method to map data from government sources onto DOT occupational listings. The Seventh

10

1 Circuit has recognized the same. *Herrmann*, 772 F.3d at 1113-14. Plaintiff
2 argues that any use of the Occupational Employment Quarterly itself is error,
3 simply because it uses the equal distribution method.

4 That argument misreads the above caselaw. The common thread in those
5 cases is that the evil is not the source of the statistics itself, but misuse of such
6 sources: experts who use sources uncritically without considering the
7 assumptions that underlie them and whether those assumptions hold true in a
8 particular context, and experts who cannot provide any rational explanation for
9 how they use their sources to arrive at the numbers they present to the ALJ.
10 That distinction is why *Kilpatrick* does not control here. (*See* Pl. Br. 10.) In
11 *Kilpatrick*, an attorney presented back-of-the-napkin math that went beyond
12 his expertise. But this case involves a vocational expert who had both the
13 Occupational Employment Quarterly and twenty years of expertise at her
14 disposal. And while the vocational expert testified that the source of her
15 numbers was the Occupational Employment Quarterly, the record contains no
16 explanation of how the expert used that source to come to her testimony–
17 because Plaintiff's counsel did not challenge her testimony on that basis.

18 The burden at Step Five rests with the Commissioner. *Tackett v. Apfel*,
19 180 F.3d 1094, 1098 (9th Cir. 1999). But an ALJ is permitted to rely on a
20 vocational expert's testimony to meet that standard. Based on its "inherent
21 reliability," a qualified vocational expert's testimony that a certain number of
22 jobs exist in the national economy that a claimant can perform "is ordinarily
23 sufficient by itself to support an ALJ's step-five finding." *Ford v. Saul*, 950 F.3d
24 1141, 1160 (9th Cir. 2020). That the vocational expert's testimony is inherently
25 reliable does not mean it is "incontestable." *Kilpatrick*, 35 F.4th at 1193 (citation
26 omitted). A claimant may probe the strength of a vocational expert's testimony
27 by asking an expert about "her sources *and* methods—where she got the
28

11

information at issue *and* how she analyzed it and derived her conclusions." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1156 (2019) (emphases added). Once a vocational expert is challenged, it is up to the ALJ to decide whether to rely on that testimony. The ALJ must consider the nature of the plaintiff's challenge, and weigh it against the expert's experience, the reasonableness of her testimony, the source of her statistics, and her ability to respond to questions about her techniques. *Id.* But the ALJ here is right that the only area that an ALJ must *sua sponte* explore—where the issue is not raised by the parties—is whether the vocational expert's testimony is consistent with the DOT. *See* AR 24-25; *see* SSR 00-4p. If it is, and if the ALJ concludes that the vocational expert's testimony withstands whatever challenges the plaintiff raises, he can credit that testimony and rely on it in his step-five analysis. *See Ford*, 950 F.3d at 1160.

This Court, in turn, is limited to reviewing whether the ALJ's resolution of that question is supported by "such relevant evidence as a reasonable mind might accept." *Id.* at 1154. Based on the way Plaintiff framed the challenge below, the ALJ was reasonable in rejecting it.

Both at the administrative level and in this Court, Plaintiff's counsel questioned the vocational expert's *source* for job numbers but did not probe the *methodology* she used to arrive at the numbers she stated to the ALJ. As set out above, this vocational expert's source is not inherently unreliable; it is merely subject to misuse. And the record provides no basis to question the ALJ's conclusion that it was not misused here. The ALJ put stock in the vocational expert's years of experience, including professional and educational counseling in the private sector (AR 25); neither below nor here has Plaintiff impeached the expert's qualifications to provide the opinion she did. In responding to counsel's and the ALJ's questions, the expert made clear that her testimony was based on

sources and also her own experience in the field. (AR 59.) While perhaps inartfully phrased, the ALJ was correct that the expert's source incorporated data that the Agency has deemed reliable, i.e., data provided by the Bureau of Labor Statistics and U.S. Census Bureau surveys. (AR 24, 415, 416.) And because Plaintiff never challenged the expert's methodology, the ALJ was entitled to conclude that the vocational expert was using the Occupational Employment Quarterly the way it was meant it to be used—as a starting point for application of her own expertise. (AR 417 (reflecting note from the publisher of Occupation Employment Quarterly saying that they "advise professionals who use this data to incorporate their own knowledge of a specific labor market").)

Plaintiff's only argument is that the vocational expert's source incorporated a problematic assumption. (AR 392.) The ALJ's analysis is adequate to address that concern. *Kilpatrick*, 35 F.4th at 1193-94. Under the circumstances, the Court finds that substantial evidence supports the ALJ's decision to credit the vocational expert's testimony.

## V. CONCLUSION

For all the foregoing reasons, **IT IS ORDERED** that the decision of the Commissioner finding Plaintiff not disabled is **AFFIRMED**.

**IT IS SO ORDERED.**

DATED: July 26, 2023

BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE